IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| TIFFANY L.,<br>        Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br>        Defendant. | Case No. 4:18-cv-04062-SLD-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 10) and the Defendant's Motion for Summary Affirmance (Doc. 14). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted. [1]

**I**

Plaintiff Tiffany L. filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) on June 7, 2011 and alleged disability beginning on April 5, 2011. Her claims were denied initially in October 2011 and upon reconsideration in January 2012. Tiffany filed a request for hearing before an ALJ which was held on April 29, 2013. At that hearing, Tiffany was represented by counsel, a vocational expert (VE) testified, and a medical witness testified. The ALJ issued an unfavorable decision in May 2013, and the Appeals Council (AC),

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 6) on the docket

upon Tiffany's request for review, remanded the claim in September 2014. The same ALJ presided over a second hearing in January 2015 and issued another unfavorable decision in that same month. Tiffany again asked the AC to review the ALJ's decision, and in June 2016 the AC remanded the claim once again.

A third hearing was held before a different ALJ, the Honorable Shreese M. Wilson (ALJ) on October 27, 2016. At that hearing, Tiffany was represented by an attorney and a VE testified. On May 9, 2017, the ALJ issued her unfavorable Decision. On March 1, 2018, the AC issued the final decision of the Commissioner which adopted the ALJ's May 2017 findings. As the parties agree, the AC included evidence not considered by the ALJ, but that evidence is not relevant to the current appeal. Tiffany timely filed the instant civil action on March 21, 2018.

## II

At the October 27, 2016 hearing, Tiffany was 35 years old and lived in her uncle's house with that uncle, her 14-year-old daughter, and her 22-month-old son. In an undated Form SSA-3368, Tiffany claimed the following conditions limited her ability to work:  irritable bowel syndrome; degenerative disc disease – back pain; rheumatoid arthritis; asthma; abnormal muscle in left leg; depression; anxiety; and panic attacks. AR 474.

She testified she was "kind of homeless" and "kind of stay[ed] at my uncle's." AR 131-32. Tiffany said she took care of her two children, and her daughter helped her "a lot" with her 22-month-old son because Tiffany could hardly walk at that time. AR 132. Tiffany explained the space in her uncle's house as its own little separate area, like an apartment. She mentioned her daughter stayed at Tiffany's mother's house too for schooling purposes. Tiffany did not drive at all in the mornings because she could not get out of bed, and when she did she had to crawl. When Tiffany finally did get in the car to drive, she experienced shooting pain down her leg.

Tiffany testified that she smoked about 15 cigarettes per day and previously used illegal substances. She went to "detox" from opiates approximately four or five months before the hearing. When asked how her bills were paid, Tiffany stated she did work for her uncle (she called it being a "personal assistant"), she picked up and cleaned up, cooked, and did laundry for him. She explained her uncle let her stay in his home until she could find somewhere to live. Tiffany had been doing that job for about a year and a half and started doing it because her uncle, a quadriplegic, needed someone to work at his home and because Tiffany's father could no longer do so and her mom asked her to do so. She testified, "I can't really do a whole lot and she, he lets me like even take a lot of breaks during work." AR 137. She worked three to five days a week for her uncle. Her mother picked up and watched her 22-month-old while Tiffany worked. The ALJ asked whether something happened that made Tiffany think she could go back to work given that there were several years she did not work. Tiffany responded that she needed money and her mother said she would "hardly be doing anything [at her uncle's house] [.]" AR 139.

Tiffany then testified about the back fusion surgery she had in November 2010. She stated the surgery did not relieve her symptoms and two of four screws placed in her back broke in half. She explained following the surgery, she had to relearn to walk which took three months. In response to the ALJ's question as to why Tiffany had not yet had the broken screw fixed (seen in a November 2013 MRI), Tiffany explained, "Every time we went to go schedule the surgery, I ended up getting pregnant. The last doctor in Peoria stated that I was too big, I would have to lose weight. Since then I've actually lost weight." AR 140. Tiffany also testified that she had a MRI scheduled that very day due to pain she felt all the way down her right leg. She experienced that pain for three or four months and it became worse recently, "[b]ut the pain in the back and [her] hip, that's been at

3

least a year." AR 141. To relieve her back pain, Tiffany used Biofreeze, put ice on her back, and took her prescribed medications. With regard to her medications, the ALJ asked about Tiffany's asthma treatment, including the use of a nebulizer as needed and an inhaler Tiffany used up to three times per day. She said she became winded if she walked up a hill. She answered her nebulizer and inhaler helped when she became short of breath.

Tiffany testified she recently obtained an order of protection against her son's father and she had been going to court for it. The ALJ noted the record showed Tiffany had "been in and out of treatment for some, for some depression, some anxiety . . . maybe some PTSD." AR 147. Tiffany answered that she recently asked her primary care physician for "something for depression" because of "everything[] going on with my kid's father." *Id*. She said her depressive symptoms affected her ability to work because she constantly thought about the situation with her son's father and she was stressed because she had to go to court that week. She explained before the situation with her son's father arose, she had issues with depression and anxiety but she controlled those issues "for a while." AR 148.

The ALJ next pointed out that in 2015 and 2016, while Tiffany was pregnant, she went to the hospital a couple of times to "detox off of Vicodin, off of some Opioid medication. At one point you're using Meth -." *Id.* Tiffany explained the last time she went through a detox program, "CADS," was in 2015 and "whenever I went to detox this last time, I didn't know I was pregnant." AR 149. She confirmed she went to detox in July 2016 as well. Tiffany stated at the times she used Meth or abused her medications, she was doing so because nothing relieved her pain. Thus, "of course, if I run out of my pain medicine, then I try to get something else." *Id.* Tiffany also confirmed that she abused her pain medication when she took it. She said she talked to her doctor to let him know her medication

was not controlling her pain, and "Actually, I have got an appointment for a pain clinic, well, a referral and I'm waiting for them to give, give me an appointment." AR 150. She said she attended a pain clinic in the past and, "of course, I was abusing pills then and so they cut me off and told me I couldn't go there anymore." *Id.* She then testified that she did not know why her "doctor now" had not referred her to a pain clinic. *Id.*

The ALJ then turned to questions regarding Tiffany's ability to lift, stay on her feet, and sit. Tiffany walked the ALJ through a typical day which included the care of her son, and while at work, she sat or laid down. She said, "If I, this was anybody else besides my family I probably would have been fired a long time ago because I have called in multiple types [sic] whenever I could not work there." AR 153. She confirmed she felt better when sober though she was "still constantly hurting with pain." AR 156. While sober, Tiffany's ability to think, function, and figure out for herself how to do things during the day was "100 percent better." AR 157. Tiffany stated she asked the doctor to not give her opiates.

Upon questioning by her attorney, Tiffany confirmed she did not have irritable bowel syndrome and her symptoms turned out to be caused by the way two of her medications interacted. Her attorney also asked Tiffany about her ability to sit, walk, lift, be on her feet, and carry. Tiffany testified she missed shifts at work for her uncle due to her health problems "[t]wo, three times a month[.]" AR 160. She also thought, "[o]ne hundred percent," her pain had an effect on her ability to pay attention to things, concentrate, maintain her focus, or to persevere to get things done. *Id.* Tiffany continued that she could not focus on anything but her pain, though she still was able to get things done. She "obviously" had to go at a slower pace when doing things and the quality with which she did things was affected as a result of her pain. AR 161.

The VE was then questioned. The ALJ asked the VE:

5

Initially I'd like for you to assume that we have an individual that's the same age that the Claimant is. So this individual was 30 as of the alleged onset date, and the individual's currently 35. This individual has the same at least high school education that the Claimant has, and the same work history that the Claimant has. Initially, I'd like for you to assume this individual would be limited to lifting or carrying 20 pounds occasionally, 10 pounds frequently. This individual would be able to stand or walk two total hours in an eight hour work day . . . Two hours in an eight hour work day. The individual would be able to sit the remainder of the day. This individual should never climb ladders, ropes, or scaffolds, no more than occasionally climb ramps or stairs, no more than occasionally stoop, kneel, crouch, or crawl. This individual additionally should avoid concentrated exposure to extreme cold, which I'll define as less than 50 degrees Fahrenheit. They should also avoid concentrated exposure to extreme heat, which I'll define as more than 90 degrees Fahrenheit. This individual should avoid concentrated exposure to humidity, so they need to be in a climate controlled environment. They should avoid concentrated exposure to irritants such as dust, fumes, odors, gases, and poor ventilation. This individual should avoid concentrated exposure to unprotected heights and hazardous machinery. Additionally, this individual would be limited to tasks that can be learned within 30 days that are routine and repetitive in nature. Given those limitations, would such an individual be able to return to any of the Claimant's past jobs?

AR 164-65. The VE responded in the negative but then identified jobs such an individual could perform. The ALJ then asked the VE whether the identified jobs were affected by the individual's need to alternate between sitting and standing. The VE responded in the negative. The ALJ asked whether the individual could maintain the jobs if he lost five minutes of production time every 30 minutes, or ten minutes per hour of production throughout the course of an eight hour work day. The VE testified that would affect the individual's ability to maintain the identified jobs. Finally, the ALJ asked whether the ability to maintain the jobs would be affected if the individual routinely was unable to show up for work or

had unscheduled call ins for missing work twice a month on a regular basis.  The VE answered in such jobs, an individual would be able to miss no more than one day per month and no more than five days in a 12 month period.

Upon questioning by Tiffany's attorney, the VE testified that the individual's absence from work once a month "is probably tolerated, but more than that is, is not."  AR 168.  The attorney then asked whether the individual could take off days throughout the initial probation period in a given job, and the VE answered that during the probationary period one should be on his best behavior and "if it looks like you're not for whatever reason they really don't have to justify it during that period."  AR 168.  The attorney later asked the VE if he heard "any limitation in that first hypothetical on the doing of routine and repetitive tasks in, in a work day, or did you hear that there is an ability to do routine repetitive tasks?"  AR 169.  The VE responded, "The ability to do routine and repetitive tasks."  *Id.*

### III

Because the parties focus their arguments upon the ALJ's May 2017 Decision (rather than the AC's March 2018 decision), the Court likewise limits its analysis to the ALJ's Decision.   In her Decision, the ALJ determined Tiffany had the following severe impairments:  degenerative disc disease of the lumbar spine post fusion; degenerative joint disease of the left knee post surgical correction; asthma; obesity; depression; anxiety; borderline personality disorder; and substance abuse disorder.  AR 22.  At Step Three, the ALJ considered the "paragraph B" criteria as part of finding that Tiffany's mental impairments did not meet or medically equal the criteria of Listings 12.04, 12.06, and 12.08.  In doing so, the ALJ determined Tiffany had mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation with regard to concentrating, persisting, or maintaining pace; and mild limitation

in adapting or managing oneself. AR 26-27. With regard to concentration, persistence, or pace, the ALJ noted Tiffany's July 2011 ADL questionnaire in which she indicated she finished what she started, her reported performance of a variety of daily activities which were limited by pain, not mental illness, and Tiffany's August 2011 consultative psychological evaluation during which she displayed adequate attention span and fair ability to concentrate. The ALJ also noted the fact that Tiffany volunteered 21 hours per week at her uncle's donut shop in 2013, 2014, and early 2015 running the cash register and handing out donuts. The ALJ finally pointed out that mental health records did not document significant impairment in concentration or attention.

> The ALJ made the following residual functional capacity (RFC) finding:
>
> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no more than two hours of standing and walking during the eight-hour workday; alternating sitting and standing for five minutes every thirty minutes; occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; no concentrated exposure to extreme cold (less than 50 degrees F), heat (no more than 90 degrees F) or humidity (needs to be in a climate controlled environment); no concentrated exposure to pulmonary irritants; no concentrated exposure to unprotected heights or hazardous machinery; tasks learned within thirty days that are routine and repetitive in nature; and no more than occasional contact with the public, coworkers, or supervisors.

AR 27. In support of that RFC finding, the ALJ discussed the Disability Report – Adult form and ADL questionnaire completed by Tiffany in June 2011 and July 2011, respectively, and a July 2011 third-party function report completed by Tiffany's mother. In her own questionnaire, Tiffany complained of back, leg, knee, and ankle pain. In the third-party function report, Tiffany's mother reported Tiffany could pay attention and mostly finished what she started, did "fine" at

following written instructions, would need spoken instructions repeated or would need to write them down, had a lot of anxiety and became worked up so she could not handle stress, and she became anxious with changes in routine.  AR 29.  The ALJ also summarized Tiffany's February 2012 Disability Report – Appeal form and her uncle Bill Hines' April 2013 letter in which he indicated Tiffany volunteered at his donut shop twenty-one hours a week.  He explained her volunteer work was required by the LINK office, she volunteered for five to six hours a day, and he said he allowed her to take frequent breaks to sit down due to her back issues and he said he only allowed her to do so because she was his niece.

The ALJ also detailed Tiffany's April 2013, January 2015, and October 2016 hearing testimony.  During the April 2013 hearing, Tiffany testified about her volunteer work at the donut shop, her medical issues, her then-current medications, her daily activities, and her pain.  She said she had "about fifteen typical days a month with maybe seven good days and seven bad days."  AR 30-31.  She said following back surgery, she had to use a walker for three months before she was able to use her back and when she went back to work, she really struggled.  AR 31.  At the January 2015 hearing, Tiffany testified she stopped her medication due to pregnancy as she was currently nine months pregnant.  She said she missed two to four days of volunteer work per month and explained she was allowed to miss those days because she was volunteering at her uncle's business.  The ALJ noted Tiffany said she missed work because of pre-existing problems, not her pregnancy.  In his discussion of Tiffany's October 2016 testimony, the ALJ noted Tiffany said she had to re-learn how to walk which took her three months.  The ALJ otherwise repeated the substance of her testimony in the Decision.  Her uncle's December 2014 letter was much the same as his April 2013 letter; Tiffany was scheduled to volunteer 21 hours per week, he allowed her to take frequent

breaks, she missed two to four days a month due to her medical issues; and he allowed her to miss those days because she was his niece.

The ALJ detailed the records pertaining to Tiffany's November 16, 2010 lumbar fusion surgery, including that as of December 6, 2010, she said she was ambulating without assistance and asked about returning to work. The doctor stated she could return to work whenever she felt comfortable doing so, and on December 14, 2010 the doctor provided a note that Tiffany "may return to work full-time with no restrictions effective December 18, 2010." AR 34, *citing* AR 645. The ALJ noted that such record evidence contradicted Tiffany's repeated claim that it took her three months after the surgery before she could use her back/to relearn to walk. The ALJ cited another notation in the record dated January 12, 2011, which released Tiffany to return to work with no restrictions.

The ALJ next detailed Tiffany's February 2011 psychiatric evaluation with John Ciaccio, M.D. during which she reported depression intermittently throughout her life. She admitted to a history of alcohol abuse for which she had undergone treatment on multiple occasions. At that time, she worked as a registration clerk. The ALJ then discussed the medical records pertaining to Tiffany's physical issues between February 2011 and June 2011. While she experienced stomach issues during that time, she testified she had to utilize FMLA and the ALJ stated, "While kidney issues have not been ongoing, it is certainly understandable why the claimant needed to be temporarily off work as of early April 2011." AR 35. When she complained of back pain after she fell in June 2011, her doctor told her she was neurologically intact, he prescribed tramadol and Flexeril, he referred her to a pain clinic, and he recommended weight loss.

In August 2011 during a consultative psychological evaluation, Tiffany complained of back pain on a daily basis up to 10 on a scale of one to 10 and was made better only by rest and medication. She said her memory was occasionally

limited, but she had more trouble with attention and concentration. Her attention span was adequate and her ability to concentrate was fair. The ALJ then considered the GAF score of record and why she did not consider it credible. She noted Tiffany "engaged in significant symptom magnification during the consultative psychological evaluation, claiming she had 1/10 pain on a daily basis; it defies credibility that the claimant experiences 'the worst pain imaginable' ever day." AR 38. The ALJ continued to explain why the GAF score was not supported by the record evidence. The ALJ indicated Tiffany's complaints of pain which she made consistently throughout the period the ALJ considered, and the medications she was prescribed for her physical and mental issues throughout that period.

The ALJ detailed treating psychiatrist Dr. Ciaccio's Medical Opinion Re: Ability to do Work-Related Activities (Mental) dated December 9, 2011 in which he opined Tiffany had limited but satisfactory ability to, among other things, understand and remember very short and simple instructions, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in a routine work setting. He also opined she was seriously limited but not precluded in her ability to carry out very short and simple instructions, maintain regular attendance and be punctual within customary, usually strict tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms. He opined she was unable to meet competitive standards with respect to maintaining attention for two hour segments and dealing with normal work stress. The ALJ said, "Although the form requested Dr. Ciaccio to explain any ratings of 'seriously limited but not precluded; unable to meet competitive standards; or no useful ability to function' and include the medical/clinical findings that supported the assessment, Dr. Ciaccio provided no rationale for his opinions." AR 41. The ALJ continued to explain how Dr. Ciaccio's additional

11

opinions were also not properly supported. The ALJ assessed Dr. Ciaccio's opinions as "deserving of limited weight" and elaborated upon her reasons for that conclusion. She stated:

> The evidence generally supports Dr. Ciaccio's opinions regarding the abilities he assessed as "unlimited or very good" and the abilities he assessed as "limited but satisfactory" and it is reasonable to conclude that the claimant is seriously limited but not precluded in her abilities to understand, remember, and carry out detailed instructions. However, the other opinions cannot be substantiated.

AR 42. The ALJ determined Dr. Ciaccio neglected to provide any rationale or medical support for the limitations he set forth, his treatment notes did not substantiate "most of his opinions regarding areas that were supposedly 'seriously limited but not precluded' or 'unable to meet competitive standards,'" his treatment records did not reflect significant difficulties with attention, concentration, or task completion, and there was no credible evidence that mental impairments as of late 2011 seriously limited Tiffany's ability to maintain regular attendance and be punctual within customary strict tolerances. AR 42. The ALJ went further still with her reasons for rejecting Dr. Ciaccio's opinions noting the evidence of record from 2012 to the present "was even less supportive of many of Dr. Ciaccio's opinions," especially considering that Tiffany worked several years at her uncle's donut shop, most recently as a part-time caregiver for her disabled uncle, and as the primary caregiver for her two children. AR 43. The ALJ concluded, "There is no indication of significant mental difficulties performing these responsibilities." *Id.*

The ALJ went on to review several more medical records spanning 2012, 2013, 2014, 2015, and 2016. She noted the results of mental status examinations throughout that time which varied and included depressed mood, normal thought content, good insight and judgment, normal, bright affect, blunted affect,

frustrated and anxious mood with flat affect but otherwise normal examination, dysphoric mood, poor insight and judgment, and normal cognition. In November 2013 Tiffany reported she was five weeks pregnant and her back pain relatively tolerable so she wanted to hold off on any surgical procedure. When she returned to the doctor in December 2013, she said she miscarried and wanted to address her back problem, and plans were made for surgery. She presented at the ER in December 2013 after overdosing on Adderall and Vicodin. Following a bar fight during which Tiffany fell down, her doctor took x-rays which revealed broken screws in her back and plans were made to schedule a surgical procedure to remove the broken screws and replace them with new screws. In March 2014, Tiffany was treated for an overdose after taking too much Vicodin and was discharged. In May 2014, she complained of thumb pain after she smashed her thumb with an ashtray. The medical record from that date provided Tiffany lied several times and obtained prescription pain medication by several means including false addresses and possibly violating a pain contract. The note further provided the doctor was concerned Tiffany injured herself to obtain prescription pain medication. A couple hours later Tiffany presented at another ER with back pain complaints though she was in no acute distress, she had normal range of motion and normal strength, and a normal mental status examination.

The ALJ continued to detail records which indicated Tiffany sought detoxification, including when she presented to the ER in July 2014 and August 2014, and when she presented for a drug assessment in November 2014 at which time she reported she was pregnant. The ALJ continued to lay out the medical records which included Tiffany's reports as to the medications she took, the pain of which she complained, and her examination results, both physical and mental. Finally, the ALJ reached the opinion evidence of record, including the State Agency psychological consultant's September 2011 opinion that Tiffany's mental

13

impairments imposed mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. The ALJ also presented, verbatim, the State Agency doctor's narrative assessment of Tiffany's functional capacity and noted the assessment was affirmed by another State Agency consultant on December 22, 2011. The ALJ "generally agree[d] with the state agency mental assessment[.]" AR 53. The ALJ reiterated the evidence of record she determined supported the weight she gave the State Agency doctor's opinion and her ultimate RFC finding.

## IV

Tiffany argues the Commissioner did not sustain her burden of proving that other work exists that Tiffany can do where: 1) the Commissioner erred in failing to address evidence of absenteeism in excess of what employers would tolerate; and 2) the ALJ erred in failing to relate deficiencies in concentration, persistence, or pace in her finding of RFC and questions to the VE.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind

14

might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566, 416.966[2]. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)    currently performs or, during the relevant time period, did perform any substantial gainful activity;

2)    suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)    suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

---

[2] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

4)    is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)    is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Tiffany claims error on the ALJ's part at Steps Four and Five.

**A**

Tiffany first argues that the ALJ erred because she did not address Tiffany's absenteeism (as evidenced by her emergency room visits, admission to the hospital, and attending medical doctors' and psychiatrists' examinations amounting to 164 days over a six year period) in her RFC finding nor did she discuss it in the body of her Decision. She contends that the ALJ recognized absenteeism as an issue by addressing it through vocational testimony, but then failed to discuss it at all in her Decision. She also argues that any issues surrounding the assessment of her hospital and doctor visits remain unexplored. The Commissioner argues Tiffany's medical appointments did not warrant additional limitations in the RFC assessment where a pattern of seeking treatment

for pain does not conclusively show disability, the ALJ is not required to speculate as to the nature and frequency of Tiffany's absences had she been working, absenteeism is not dispositive evidence of disability, and the ALJ was not required to address absenteeism explicitly where the evidence did not show Tiffany would need to be absent from work regularly.

As an initial matter, Tiffany argues that because the ALJ did not provide discussion on the issue of absenteeism, there is no post hoc rationalization that can remedy the ALJ's failure in the first instance. She would have it so that she can raise an argument in her Motion for Summary Judgment to which the Commissioner is unable to respond at all (or otherwise risk being in violation of the Chenery Doctrine). That is an untenable position. Under the Chenery Doctrine, the Commissioner's lawyers cannot defend the agency's decision on grounds that the agency itself did not embrace. *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012), *citing SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). In fact, here, the ALJ *did* discuss Tiffany's absenteeism in the context of the work for her uncle at the donut shop and also in the context of Dr. Ciaccio's opinion as to her ability to work, though it is true the ALJ did not explicitly note the 164 days Tiffany spent at the ER, admitted to a hospital, or attending doctors' appointments and psychiatrists' examinations. Also, the Commissioner does not run afoul of Chenery by simply responding to Tiffany's argument about absenteeism by pointing out what an ALJ is not required to do in a Decision and what the ALJ actually did in the Decision in this case.

A claimant's RFC "is the most he can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1). "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009), *citing* SSR 96-8p.

17

Moreover, a hypothetical question posed to the VE must include all limitations supported by the medical evidence in the record. *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018). Here, Tiffany focuses upon the sheer number of times that appear in the record when she was in the ER, admitted to the hospital, or attended doctors' appointments and psychiatrist examinations. She argues such evidence on its face strongly suggests she would be absent from work far in excess of the permitted amount of time off work as testified to by the VE. Her argument ignores the fact that the ALJ wrote a 38-page Decision, the bulk of which was the ALJ's discussion of Tiffany's medical records dated between 2011 and 2016 and all the impairments of which she complained limited her ability to work. The ALJ's review of that evidence led her to conclude that the evidence failed to establish that Tiffany was "nearly as limited as she alleges." AR 53. The ALJ explained how the allegations of disabling physical impairments were not borne out by the medical evidence where Tiffany's asthma was generally controlled with prescribed treatment, objective medical findings were limited (as it pertained to her back issues), some medical records suggested she might be exaggerating her pain level or even possibly injuring herself in order to obtain pain medication, her pain and resulting limitations were "apparently not sufficiently limiting to persuade the claimant to take the necessary steps to avoid pregnancy long enough to undergo the [back surgery to replace broken screws]." AR 53-54. The ALJ also explained how Tiffany's alleged mental health issues were not as limiting as she alleged where medications for depression, anxiety, and a personality disorder were fairly effective at controlling her mental illness symptoms when she took them consistently, mental status examinations had often been normal or fairly normal, and her reported activities did not substantiate overall impairment in mental functioning.

In the ALJ's consideration of Tiffany's part-time volunteer work at her uncle's donut shop, the ALJ stated:

> Although [Tiffany] reportedly required extra breaks and missed days of work (which would not have been tolerated of other employees), she testified that she was often the only employee in the store and did everything required to keep the store running . . . Her attendance and job performance was presumably acceptable if her uncle was willing to allow her to operate the store alone for hours.

AR 54. Earlier in the Decision, the ALJ explained that a note dated December 14, 2010 which provided Tiffany could return to work full-time with no restrictions (following lumbar fusion on November 16, 2010) effective December 18, 2010 contradicted Tiffany's "repeated claim that it took her three months after the surgery before she could use her back/to relearn to walk." AR 34. Later, the ALJ noted Dr. Ciaccio opined, among other things, that Tiffany would miss about two days of work a month due to her impairments or treatments. The ALJ determined Dr. Ciaccio's opinions deserved limited weight where there was "no credible evidence that mental impairments, especially as of late 2011, seriously limited the ability to maintain regular attendance and be punctual within customary strict tolerances" and "[t]here [was] no credible evidence that mental impairments would cause missed work with any regularity." AR 42, 43. While Tiffany argues "there are peripheral issues that affect the assessment of absenteeism due to hospital and doctors' visits," she does not go so far as to argue that the ALJ's consideration of the vast medical record included a failure to consider a line of evidence contrary to the ALJ's ruling. Nor could she as the sheer number of doctors' visits, etcetera are encompassed by the vast medical record the ALJ explicitly considered.

As the Commissioner argues, an ALJ is not required to speculate. The Court agrees with the district court's reasoning in *Stone v. Berryhill*, No. 17-cv-3193, 2018

WL 5300381, at *19 (C.D. Ill. Oct. 24, 2018).  In that case, the claimant argued the ALJ did not consider whether her frequent doctor's appointments and other treatment would preclude her from working.  The Stone court disagreed and stated:

> The ALJ is required to articulate minimally her analysis of the material relevant evidence . . . The ALJ is not required to speculate. Stone is speculating on what she would have done had she been working.  If Stone had been working, she might have scheduled her medical appointments on her days off or combined appointments. No one knows.  No one knows because this argument is all speculation.  The ALJ did not err in omitting such speculation from her decision.  If numbers of doctors' visits alone could establish disability, claimants would only need to schedule enough visits.

*Id*. (internal citations and footnote omitted).[3]  Ultimately, the Court can trace the path of the ALJ's reasoning between the evidence and RFC finding which omitted any limitations due to absenteeism and that RFC is supported by substantial evidence.  *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").

　　As for Tiffany's reliance upon the fact that the ALJ questioned the VE about absenteeism without further mention of it in the RFC finding or Decision, that alone is insufficient to warrant a reversible error finding.  "The ALJ must question the [VE] regarding every impairment set forth in the claimant's record to the extent that the impairment is supported by the medical evidence."  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).  Thus, where an ALJ incorporates well-supported RFC

---

[3] The Court notes that Tiffany argues the evidence of the number of days she spent at the hospital, visiting doctors, etcetera "suggests" she would be absent from work in excess of the permissible time one may be absent from work.  Even she does not argue with certainty but clearly believes the ALJ was required to not just consider her absenteeism but find it certainly job-preclusive as well.

findings into the hypotheticals she poses to the ALJ (as done here), the ALJ does not err in relying on the VE's testimony and is not required to incorporate the VE's response to a restriction she does not include in her assessment. *Dross-Swart v. Astrue*, 872 F. Supp. 2d 780, 800-01 (N.D. Ind. 2012); *see also Flynn v. Astrue*, 563 F. Supp. 2d 932, 946 (N.D. Ill. 2008) (finding the ALJ made proper use of the VE's testimony where the ALJ posed hypotheticals to the VE that were supported by the medical evidence and those resulted in testimony supporting a finding of no disability though the claimant argued the ALJ's hypotheticals to the VE that assumed she would miss three days of work per month and could not remain on task throughout a work day prompted the VE to respond a person with such limitations would not be able to hold a job).

### B

Tiffany next argues that it is clear from the VE's testimony that he was not presented with any limitations in the performance of unskilled work, though the ALJ determined Tiffany had moderate limitations in concentration, persistence, or pace that would be reflected in the ALJ's RFC finding. The Commissioner argues Tiffany has not met her burden of showing the RFC inadequately accounted for her moderate restrictions or that those restrictions prevented her from performing all work, State Agency Dr. Boyenga's opinion is substantial evidence in support of the ALJ's RFC assessment, and Tiffany does not identify evidence the ALJ failed to address that would warrant additional limitations in the RFC.

"Both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019). Of course, the VE must understand a claimant's limitations in concentration, persistence, and pace. *Radosevich v. Berryhill*, 759 F. App'x 492, 494 (7th Cir. 2019), *citing Moreno*, 882 F.3d at 730. Here, the ALJ's RFC finding provided Tiffany was limited, in relevant part,

to "tasks learned within thirty days that are routine and repetitive in nature." AR 27.

In his consideration of Dr. Ciaccio's opinion that Tiffany was seriously limited but not precluded in her ability to carry out very short and simple instructions, the ALJ explained Dr. Ciaccio's "treatment records do not reflect significant difficulties with attention, concentration, or task completion[.]" AR 42. The ALJ went on to note Tiffany reported in July 2011 that she prepared complete meals, drove, shopped, managed money, performed a variety of typical household chores, finished what she started, was good at following spoken instructions and could follow written instructions but had to read them a few times. The ALJ further noted the fact Tiffany lived alone raising her daughter by herself and performing a wide variety of "typical daily activities without prompting/encouragement" contradicted her alleged serious limitation in sustaining an ordinary routine without special supervision. *Id*. The ALJ also rejected Dr. Ciaccio's opinion that Tiffany was unable to meet competitive standards with respect to maintaining attention for two-hour segments where his treatment notes did not reflect any significant impairment in sustained concentration and attention. Toward the end of her Decision, the ALJ restated State Agency Dr. Boyenga's entire narrative as to Tiffany's functional capacity, and the ALJ explained she "generally agree[d] with the state agency mental assessment[.]" AR 53. The ALJ pointed out the evidence suggested Tiffany's medication had been fairly effective at controlling her mental illness symptoms when taken consistently, and her mental status examinations were often normal or fairly normal.

Whereas the ALJ discussed the medical and opinion evidence at length and explained why a more restrictive RFC was not warranted, as the Commissioner argues, Tiffany does not identify evidence the ALJ failed to address that would

22

support additional limitations in the RFC.  Here, Tiffany focuses on just the words alone that the ALJ used in her RFC and hypothetical question to the VE; she takes no issue with the ALJ's evaluation of Dr. Ciaccio's opinions nor of the State Agency doctors' opinions, and she fails to recognize that the Seventh Circuit Court of Appeals has upheld RFC determinations when they "adequately account for the claimant's demonstrated psychological symptoms." *Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019).  The ALJ built a logical bridge between the evidence of Tiffany's impairments and the limitations they caused *as supported by the record* and the conclusion that Tiffany was accordingly limited only insofar as set forth in the RFC finding.  *Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).  Stated simply, the Court finds the hypothetical question to the VE is substantially supported by the medical and other relevant evidence of record.

## V

For the reasons set forth above, it is recommended that:  1) the Plaintiff's Motion for Summary Judgment (Doc. 10) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 14) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, denying benefits to the Plaintiff, Tiffany L., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation.  FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.

*Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on June 17, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE

24